## ROLLINS v. McDONALD.

(Circuit Court of Appeals, First Circuit. August 25, 1925.)

No. 1739.

1. **Logs and logging** ⟜8(3)—**Knowledge of violation of provision of contract and failure to insist on its performance held waiver of such provision.**

Plaintiff's failure to insist that person with whom she contracted for cutting of her timber and manufacture and sale of lumber should personally market lumber was waiver of that provision of contract, where she knew of his arrangement with defendant that latter should market same.

2. **Principal and agent** ⟜1—**Defendant, advancing money to logging contractor and marketing lumber, held agent of contractor.**

Defendant, who with knowledge of logging contract to cut and market plaintiff's timber, advanced money to contractor and marketed the lumber, collecting the proceeds, held agent of such contractor.

3. **Logs and logging** ⟜8(5) — **Evidence held sufficient upon which to find that defendant knew of terms of lumber contract between plaintiff and logging contractor.**

Evidence held sufficient upon which to find that terms of lumber contract between plaintiff and individual employed by her to cut and market it were known to defendant, who financed operations and marketed lumber, retaining proceeds to defray expenses.

4. **Logs and logging** ⟜8(1)—**Logging contract held not sale of standing trees, but employment of individual to cut and saw lumber.**

Logging contract to cut, saw and market lumber from plaintiff's trees, contractor to pay agreed stumpage, and after deduction of operating expenses to share equally profits of operation with plaintiff held not sale of standing trees but contract of employment.

5. **Logs and logging** ⟜8(1) — **Contract construed as reserving title and right of possession in owner of timber until payment for stumpage.**

Logging and lumbering contract, construed as reserving title and right of possession in owner of timber when cut and sawed into lumber until agreed stumpage price was paid.

6. **Logs and logging** ⟜8(3)—**Owner of lumber held to have waived provision in contract requiring payment of stumpage price before shipment of lumber for market.**

Owner of lumber held to have waived provision in contract requiring payment of stumpage price before shipment of lumber 'for market, where she knew the lumber was being shipped and marketed without payment of the stumpage fee, and she made no objection thereto.

7. **Logs and logging** ⟜8(5)—**Evidence held to show owner of lumber agreed with her employé, cutting and marketing it, that stumpage required by contract to be paid prior to shipment of lumber for market, should be paid out of proceeds of lumber sales.**

Evidence held to show owner of lumber agreed with logging contractor that stumpage required by contract to be paid prior to shipment of lumber for market should be paid out of proceeds of lumber sales, and that contractor's agent knew of such agreement.

8. **Logs and logging** ⟜8(3) — **Sale of lumber by defendant, pursuant to agreement with plaintiff owner, could not constitute conversion of such lumber.**

Sale of lumber by defendant, pursuant to agreement with plaintiff owner, could not constitute predicate for charge of conversion of such lumber.

9. **Logs and logging** ⟜8(3)—**Defendant, marketing lumber for plaintiff's contractor, and retaining proceeds to reimburse him for advances, held liable to plaintiff for stumpage price.**

Defendant, marketing lumber for plaintiff's logging contractor, and retaining proceeds to cover advances to such contractor, held liable to plaintiff for stumpage price he knew plaintiff was entitled to before deduction of operating expenses.

10. **Money received** ⟜5—**That defendant, in retaining proceeds of lumber sales to which he knew plaintiff was entitled, acted as agent of logging contractor, held not to relieve him of liability for amount so retained.**

Where defendant, who acted as agent of logging contractor in marketing lumber cut from plaintiff's timber, and advanced money to such contractor, knew that under the contract plaintiff was entitled to payment of stumpage out of proceeds of sale of lumber before operating expenses were to be deducted by contractor, and that plaintiff had not been paid full amount of stumpage, defendant, in retaining out of proceeds moneys advanced and expended, was liable to plaintiff as for money had and received, and the fact that he had no contractual relations with plaintiff, or that he was acting as contractor's agent, did not relieve him from such liability.

In Error to the District Court of the United States for the District of New Hampshire; George F. Morris, Judge.

Action by Mary E. McDonald against Ellsworth H. Rollins. Judgment for plaintiff, and defendant brings error. Affirmed.

Conrad E. Snow, of Rochester, N. H. (Snow & Cooper, of Rochester, N. H., and Owen & Veazey, of Laconia, N. H., on the brief), for plaintiff in error.

Everett W. Crawford, of Boston, Mass. (James W. Remick, of Concord N. H., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. This is an action of assumpsit, with a count in trover, to recover the value of timber and hard wood cut on Rattlesnake Island in Lake Winnepesaukee in the state of New Hampshire, between March 1, 1915, and June 1, 1916. The case was heard by the District Judge without a jury.

The plaintiff had become the owner of certain standing timber on this island, with the right to cut and remove the same before June 1, 1916, and through her husband, John F. McDonald, made a written contract dated February 23, 1915, with one George W. Fifield of Alton, in the state of New Hampshire, since deceased, for cutting, sawing, and marketing it.

In January, 1915, Fifield had entered into an arrangement with the defendant to finance him in his operations, with the understanding that the defendant should furnish all money necessary for cutting and sawing the timber and the transportation of the lumber to the cars, and should also sell the lumber, and for his services he was to receive the sum of $1 per thousand for all lumber sold by him, and 6 per cent. interest on all money advanced, and that he should reimburse himself for advances and pay his commission and interest from the proceeds of sales. In order, perhaps, to give himself a better business standing, Fifield carried on the business of marketing and selling lumber under the name of Fifield Lumber Company.

The contract entered into between the plaintiff and Fifield, so far as material, is as follows:

"1. The said Fifield agrees to cut, or cause to be cut all of the sawable lumber that can be cut and operated at a profit on said Rattlesnake Island on or before June 1, 1916, with such extension as can be secured; that the said Fifield shall either personally cut or cut by contract made by the said Fifield with some responsible party satisfactory to the said McDonald all of said trees on or before said date specified, all the bills of lading for the property thus cut being in the name of Fifield Lumber Company. The said Fifield shall be in entire charge of the cutting and all other lumbering operations. * * *

The said Fifield agrees to pay to the said McDonald four dollars ($4.00) per thousand stumpage, for the trees, logs or lumber of any or all descriptions, exclusive of cord wood, cut on said Rattlesnake Island, the said Fifield, however, not being obliged to pay therefor until said lumber is sold. On all such cord wood as may be cut the said Fifield will pay such sum as may be agreed upon. It is mutually agreed that immediately upon the severance of the trees, logs, or lumber, the interest of the said McDonald thereupon arises therein to the extent of four dollars ($4.00) per thousand feet the stumpage therein referred to, plus one-half of the profits over the net cost of the operations.

"2. It is further mutually agreed that said Fifield will forward to said McDonald, upon the loading of each and every car, a bill of lading of such car with the number of feet thereon, and pay for same to the said McDonald the sum of four dollars ($4.00) per thousand when car leaves Alton, in the state of New Hampshire. Any shortage that may arise shall be adjusted later between said Fifield and said McDonald, and that next shall be deducted and retained by said Fifield the cost of cutting, operating, loading, and shipping said lumber, and one half the balance that still remains shall also be retained by the said Fifield, the other half of such net proceeds to be forwarded by the said Fifield to the said McDonald, within seven (7) days of the payment by purchaser of said lumber. * * *

"4. It is further mutually agreed that the said Fifield shall faithfully and properly superintend all of the lumber operations, and said operations and all of them shall be conducted in an economical and in the best manner possible; shall keep proper books of account open to the inspection of the said McDonald, or her agent, at all proper times; that all bills shall be paid promptly by the said Fifield; that he shall receive no compensation for his services other than one-half of the profits of the said operations after paying all expenses; that the said Fifield shall provide all the necessary funds for carrying on the said lumbering operations; and that the said McDonald shall not be required to advance any money whatsoever for the opera-

tions; and that the share in the profits of the business to be received by the said Fifield shall be in lieu of salary; and that said McDonald and the said Fifield shall in no wise be considered partners. * * * "

The defendant had had large experience in lumbering in the state of New Hampshire, and was known to be a man of large means. Fifield made a contract with one Rattie to cut, saw, and stick all timber on the island for the price of $8 per thousand. Rattie's operations began March 1, 1915, and continued down to March, 1916. He was paid by the defendant on Fifield's orders, and his pay rolls were approved by the latter and sent to the defendant for payment. Other bills were paid by the defendant for Fifield in the same manner. Superintendence of the entire operations was conducted by Fifield, and the defendant was on the island only twice during the entire operation, and then with prospective customers for the lumber. Rattie rendered bills for cutting, sawing, and sticking 3,072,654 feet of lumber, and was paid for that amount. The defendant sold 2,536,832 feet of lumber, and received $42,896.31 for the same, and has retained it to repay himself for his advances, services, and interest. The District Judge has found that, after deducting the amount chargeable to operating expenses, $3,784.75 remained to pay for stumpage so that there would be no profit to divide between McDonald and Fifield, as this sum is far less than the amount due for stumpage.

The foregoing facts were found by the presiding judge, and his findings are fully sustained by the evidence. He has also found that the defendant had full knowledge of the terms of the contract between Fifield and McDonald from its inception, although Rollins denied that he had such knowledge.

From all the facts in the case and the relations of the parties, we think this finding is fully sustained. It is inconceivable that the defendant would have advanced, as he testified, more than $20,000 to pay the expenses of this lumbering operation before any lumber was sold, without knowing all the terms of the contract between Fifield and the plaintiff, in view of his long experience in lumbering operations and the further fact that Fifield himself did not have the financial means with which to carry out the contract.

Fifield died early in the spring of 1918, without having made any settlement with the plaintiff, and his estate was insolvent. All the lumber, with the exception of two small lots, was shipped in the name of the Fifield Lumber Company, but bills of lading showing the number of feet in each shipment were not sent to the plaintiff, nor was the stipulated stumpage of $4 per thousand paid to her before the lumber left Alton, as was provided by the contract.

The District Court has found that the plaintiff "never waived any of the conditions of it (the contract) except so far as to permit the marketing of the lumber without insisting on payment for each carload as soon as the car left Alton. Waiver of this part of the contract is to be inferred only from the fact that such payments were not insisted on."

The court also found that, while the plaintiff knew that the defendant was financing Fifield in his operation, she did not know the terms of the contract between them.

[1] It conclusively appears from the record that the plaintiff did know that the lumber was being marketed by the defendant, and the failure upon her part to make a protest or to insist upon the performance of the contract in this respect was, we think, a waiver by her of this provision.

The presiding judge construed the contract to be one of bailment, and held that, although the timber, when standing and when severed from the soil, was delivered to Fifield for the purpose of cutting, sawing, and manufacturing into lumber and sale, the plaintiff held the title and right of possession of both the standing trees and the lumber manufactured from the same until she received her stumpage in accordance with the terms of the contract, and that, for his services in cutting the trees and marketing the lumber, Fifield was to receive one-half of the net proceeds. He also ruled that, by the terms of the contract, Fifield was the authorized agent of the plaintiff to sell and transfer title to the lumber; but that, to secure to the plaintiff the value of the stumpage "she provided that her agent should pay it before delivery of the lumber to prospective purchasers"; that the possession of Fifield for the purpose of cutting the trees and converting them into lumber and in marketing the same, was the possession of the plaintiff, and that title remained in her until she was paid her stumpage of $4 per thousand; "that, so far as Fifield conducted his operations as it was contemplated in the contract, he was within his rights, but, when he exceeded his contract rights, he committed a wrong. He had no right to dispose of the lumber except in accordance with the terms

of the contract. When he did so he was guilty of a conversion."

He also ruled that the defendant was Fifield's agent for performing a part of Fifield's services under the contract and that "his delivery of the lumber without first having paid the plaintiff her stumpage was, under the circumstances, a conversion for which he was liable."

He found that the evidence did not warrant him in finding that Rollins sold more than 2,536,832 feet; that the stumpage on this, at $4 per thousand, is $10,147.33; that deducting from this $2,000 payments made by the defendant to the plaintiff leaves a balance of $8,147.33, which, with interest, makes a total of $11,365.53 for which the court ordered a verdict.

[2-5] We agree with the learned District Judge that the defendant was the agent of Fifield, and that there was ample evidence upon which to find that the defendant knew about the terms of the contract between the plaintiff and Fifield. We also agree with his construction of the contract, that it was not a sale of the standing trees, but the employment of Fifield to cut and saw the same, and that the contract, read in the light of all the circumstances surrounding it and the usual conduct of lumbering operations, fairly disclosed that it was the intention of the parties that the title to the timber, when cut and sawed into lumber, should remain in the plaintiff with the right of possession until she should receive her stumpage of four dollars per thousand.

[6, 7] We do not agree, however, with his conclusion that, in the sale of the lumber before the payment to the plaintiff of her stumpage, the defendant was guilty of conversion, because we think that her conduct, as well as all the circumstances, established a waiver of the payment to her before the shipment of the lumber from Alton. Shipments began in July, 1915, and the last was made September 17, 1917. A payment of $1,000 on account of stumpage was made to her by the defendant at Fifield's request on October 16, 1915, and another of like amount October 22, 1917, after all the lumber had been shipped, and these were all the payments made to her. She knew that the lumber was being shipped and marketed by the defendant and made no objection. We can reach no other conclusion than that either she or her husband, who was her agent, consented to the same. Under one of the provisions of the contract none of the lumber was to be paid for by Fifield until it was sold, and from this and the conduct of the parties it can be fairly inferred that plaintiff had agreed the stumpage should be paid out of the proceeds of the sales, and that the defendant knew this.

[8-10] The defendant was not guilty of conversion by selling the lumber as the agent of Fifield, as this was in accordance with the understanding and intent of the parties; but, having sold it and received the proceeds, knowing that the plaintiff under her contract with Fifield was entitled to her stumpage of $4 per thousand to be paid to her out of them, before the expenses of operation could be deducted, and having retained all the proceeds to reimburse himself for his advances, he is liable, under the count in the declaration for money had and received, for the same amount as the learned District Judge has found to be the damage under the count for conversion. That the defendant had no contractual relations with the plaintiff or was acting as the agent of Fifield will not relieve him from liability under this count, for he knew, when he sold the lumber and received the proceeds, that, according to the terms of the plaintiff's contract with Fifield, his principal, she was entitled to her pay for stumpage out of them before any deduction could be made for operating expenses. He therefore had in his hands in his own right and not as Fifield's agent money that he had no right in equity and good conscience to retain in payment for his own advances. Gaines v. Miller, Adm'r, 111 U. S. 395, 4 S. Ct. 426, 28 L. Ed. 466; Cary v. Curtis, 3 How. 236, 246, 11 L. Ed. 576; Brewer v. Dyer, 7 Cush. (Mass.) 337, 340; Bither v. Packard, 115 Me. 306, 312, 98 A. 929; Knapp v. Hobbs, 50 N. H. 476; Revere Sugar Refinery Co. v. Stone & Downer Co. (D. C.) 285 F. 167, 173.

The judgment of the District Court is affirmed, with costs to the defendant in error in this court.